# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROBIN J. RONOWSKI,**
                    **Plaintiff,**

          **v.**                                                    **Case No. 05-C-587**

**JO ANNE BARNHART,**
**Commissioner of the Social Security Administration,**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Robin Ronowski applied for social security disability benefits, alleging that he was unable to work due to foot pain, tendinitis and obesity. The Social Security Administration ("SSA") denied his claim, as did an Administrative Law Judge ("ALJ") following a hearing. The Appeals Council then denied plaintiff's request for review, making the ALJ's decision the final decision of the SSA. Indoranto v. Barnhart, 374 F.3d 470, 473 (7th Cir. 2004). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A.    Disability Standard

In order to obtain benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has adopted a sequential five-step test for determining whether

a claimant is disabled. Under this test, the ALJ must determine: (1) whether the claimant is presently working; (2) if not, whether the claimant has a severe impairment or combination of impairments;[1] (3) if so, whether any of the claimant's impairments are listed by the SSA as being presumptively disabling;[2] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[3] and (5) if not, whether the claimant is able to perform any other work in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled. A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled. The claimant carries the burden of producing evidence at steps one through four, but if he reaches step five, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work despite his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. Elbert v. Barnhart, 335 F. Supp. 2d 892, 895

---

[1]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[2]These impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. ,"the Listings").

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

2

(E.D. Wis. 2004). However, the ALJ may not rely on the Grid to deny a claim if the claimant's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although he may use the Grid as a "framework" for making a decision. Samuel v. Barnhart, 295 F. Supp. 2d 926, 929 (E.D. Wis. 2003).

**B. Standard of Review of ALJ's Decision**

Under § 405(g), the district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the scope of the court's review of is limited to determining whether the ALJ's decision is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such evidence as a reasonable person could accept as adequate to support a conclusion. Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997). A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. Id.; Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989). The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. See Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991). Nevertheless, any legal errors must be harmful in order to merit reversal and remand. See Keys v. Barnhart, 347 F.3d 990,994-95 (7th Cir. 2003) (applying harmless

3

error doctrine to social security disability determination); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

## II.  FACTS AND BACKGROUND

### A.    Plaintiff's Application and Administrative Decisions

Plaintiff applied for disability insurance benefits and supplemental security income on February 12, 2002 (Tr. at 50; 149), claiming that he was disabled since July 20, 2001 (Tr. at 48) due to tendinitis (Tr. at 53; 151).  He indicated that he had in the past worked as a cook and a dishwasher (Tr. at 71; 88), but stopped due to: "not enough pay, dim-witted management, long hours, hard working conditions."  (Tr. at 70.)

The SSA denied plaintiff's applications initially on July 30, 2002 (Tr. at 26; 156) and on reconsideration on December 17, 2002 (Tr. at 30; 160).  Plaintiff requested a hearing (Tr. at 34-35) and on August 17, 2004 he appeared pro se before ALJ James Knapp (Tr. at 36; 164).

### B.    The Hearing

At the outset of the hearing, the ALJ asked plaintiff if he had reviewed the exhibits in the record and whether he had any objection to them; plaintiff answered no.  (Tr. at 166.) The ALJ then asked plaintiff whether there were any other medical reports he was aware of that would assist in deciding the case; plaintiff again said no.  (Tr. at 167.)  The ALJ next stated that plaintiff had been advised of his right to representation in the notice of hearing, and noted that plaintiff had signed a form waiving his right to representation.  (Tr. at 167; see

4

also Tr. at 47.)  He asked plaintiff if he was willing to proceed without a lawyer, and plaintiff said that he was.  (Tr. at 167.)  The ALJ then proceeded to take testimony.

### 1.    Plaintiff's Testimony

Plaintiff testified that he was 6'3" tall, weighed 400-450 pounds, and lived with his mother and grandmother.  (Tr. at 167.)  He stated that he had never driven a car and the last grade he had completed in school was ninth.  He said that he had in the past been employed as a cook and dishwasher, and that the heaviest weight he had to lift in those jobs was more than 100 pounds.  He stated that he last worked in July 1999 and stopped because the job would not pay more.  (Tr. at 168.)

When asked what kept him from working, plaintiff stated that he was helping care for his grandmother, who needed constant care.  He stated that if she was not a factor he could go out and get a job, but he did not know how well he would do with cooking, which was all he had ever done.  He testified that he did not believe he could "pound around on fire tile for eight to 14 hours per day" due to the heat and pain in his feet.  (Tr. at 169.)  He stated that he had pain in his feet between once and five times per month, which lasted from three to seven days with varying intensity.  (Tr. at 169-70.)  He said that he treated the pain with Celebrex and Advil, which lowered the intensity, and elevated the foot and put ice on it when there was a lot of swelling.  (Tr. at 171.)  He testified that when he was not experiencing a flare-up he could walk a couple of miles with no problem, but during an episode he could not even walk around the house.  He stated that he also had carpal tunnel in his wrist, for which he wore a wrist brace.  (Tr. at 172.)  He testified that he was able to use his hands fairly well when the carpal tunnel was not acting up; he was able to button his clothes.  (Tr. at 173.)

5

Plaintiff testified that on a typical day he took care of his grandmother – helping her go to the bathroom, getting her medication, feeding her – and otherwise sat and watched movies. He stated that he pretty much acted as a nurse for his grandmother from 5:30 a.m. until 7:00 p.m. when his mother came home, then she would take over. He cooked meals, vacuumed once per week, and played computer games, but a yard service cut the grass and his mother did the laundry. (Tr. at 174.) Plaintiff testified that he could stand in one place for about an hour, had no difficulty sitting, and was able to lift his grandmother, who weighed 130 pounds. (Tr. at 175.)

### 2. VE's Testimony

The VE, Beth Hoynik, testified that plaintiff's past work as a dishwasher was medium, unskilled work, and his work as a cook was medium, semi-skilled work. (Tr. at 176-77.) She stated that plaintiff would have no transferrable skills from his past employment. (Tr. at 181.)

The ALJ then asked the VE hypothetical questions. The first assumed a person of plaintiff's age, education and work history limited to lifting ten pounds frequently and twenty pounds occasionally, with standing limited to fifteen minutes at a time and two hours maximum in an eight hour day, with no significant or continuous walking and no climbing. (Tr. at 177.) The VE testified that such a person could work as an assembler, hand packager, cashier and information clerk. (Tr. at 178-79.) If the person had to periodically elevate his foot to stool level while seated, the assembly, hand packaging and information clerk jobs could still be done. (Tr. at 179-80.)

6

## C.    Medical Evidence

On July 18, 2001, plaintiff was seen by Dr. Jeffrey Sterling at St. Joseph's Hospital, complaining of intermittent right foot and ankle pain of several month's duration.  (Tr. at 114, 116, 120.)  On examination, Dr. Sterling noted some swelling, and an x-ray revealed no evidence of fracture but a small to moderate sized plantar calcaneal spur, as well as a spur at the insertion of the Achilles tendon.  (Tr. at 117, 118.)  Plaintiff's foot was iced and elevated, and he was given a T-band and shown exercises for ankle strengthening.  (Tr. at 120.)  Dr. Sterling diagnosed plantar fasciitis[4] and prescribed Celebrex (Tr. at 113), and advised plaintiff to follow-up with his regular physician, Dr. Daniel Tanty (Tr. at 115).  On August 31, 2001, plaintiff contacted Dr. Tanty regarding his foot pain, and the doctor called in a prescription for Celebrex.  (Tr. at 122.)

On July 13, 2002, plaintiff was examined by Dr. Daniel Jankins at the behest of the SSA.  Plaintiff complained of pain that switched between his feet and ankles, which he described as a "white, hot railroad spike."  (Tr. at 125.)  He stated that he experienced flare-ups every three to four weeks, which lasted three to five days.  In between these episodes, he stated that he could walk one to two miles without too much of a problem.  Plaintiff stated that he took Celebrex, but it did not help much.  Dr. Jankins found plaintiff to be morbidly obese, and plaintiff reported that he had gained 170 pounds in the last two to three years.  (Tr. at 125.)  On examination, Dr. Jankins found plaintiff to stand 6'3" tall and weigh 410 pounds.  His blood pressure and pulse rate were normal.  Plaintiff was able to get up onto and off of the exam table, and his gait was normal.  His grip strength was 5/5 bilaterally, and

---

[4]This is inflammation of the tissue of the soles of the feet.  Stedman's Medical Dictionary 652 (27th ed. 2000).

7

he had full range of motion of the spine with no palpable back pain. He had straight leg raising to at least 60 to 75 degrees bilaterally and full range of motion of both knees. There was some distal pretibial edema, but he did not have any palpable ankle or foot pain and had fairly full range of motion of both ankles. He was able to perform heel-to-toe ambulation. Dr. Jankins concluded that he did not have a good explanation for the "bizarre significant pain" plaintiff intermittently experienced in his feet. He wrote: "It very much sounds soft tissue and possibly could be intermittent fasciitis, although I am not sure." (Tr. at 126.)

On July 22, 2002, state agency consultant Dr. John McDermott reviewed the file and prepared a physical RFC assessment. He opined that plaintiff could lift up to fifty pounds occasionally and twenty-five pounds frequently, stand/walk six hours out of an eight hour workday, sit less than six hours in an eight hour day, and push/pull in unlimited fashion. (Tr. at 129.) He found no postural limitations (e.g., climbing, balancing, stooping, kneeling, crouching, crawling). (Tr. at 130.) On December 6, 2002, consultant Dr. Joan Crennen also completed an RFC assessment, in which she agreed with all of Dr. McDermott's findings save that pertaining to sitting: she believed plaintiff could sit about six hours in an eight hour workday. (Tr. at 137.)

On January 22, 2003, Dr. Tanty completed an RFC questionnaire, in which he indicated that plaintiff suffered from tendinitis of both feet and the left wrist, which had responded poorly to treatment. He wrote that this was a "clinical diagnosis" with a normal x-ray, and that plaintiff was treated with ice, elevation and Celebrex. (Tr. at 144.) Dr. Tanty opined that plaintiff could walk about ten blocks without pain, could continuously sit for more than two hours with his feet elevated, could continuously stand for one hour, stand/walk

8

about two hours total in an eight hour workday, and sit at least six hours in an eight hour workday. He stated that plaintiff required the ability to shift positions from seated to standing at will and had to take unscheduled thirty minute breaks every two hours during an eight hour workday, and that plaintiff's legs should be elevated to foot stool level during prolonged sitting. (Tr. at 145-46.) He opined that plaintiff could frequently lift up to ten pounds and occasionally lift twenty pounds. He further opined that plaintiff could use his left hand for grasping, turning and twisting, and for fine manipulations 25% of the day, but was not otherwise limited in his ability to use his hands and arms for repetitive activities; nor was he limited in his ability to bend or twist at the waist. He stated that plaintiff would be absent about once per month due to his impairments. (Tr. at 147.)

## D.    ALJ's Decision

On September 22, 2004, the ALJ issued a decision denying plaintiff's claim. Following the sequential five-step procedure, he found that plaintiff was not working (Tr. at 22 #2) and that he had severe impairments – recurrent bilateral foot pain possibly secondary to tendinitis or plantar fasciitis, and morbid obesity.[5] (Tr at 19.) However, he concluded at step three that such impairments did not meet or equal a Listing. There was no evidence of major dysfunction of a joint or loss of motor strength or sensation, and plaintiff ambulated normally. (Tr. at 20.)

The ALJ next determined that plaintiff retained the RFC to lift ten pounds frequently and twenty pounds occasionally, stand for up to fifteen minutes continuously and two hours

_____

[5]The ALJ found that plaintiff's left wrist problem was not a severe impairment because he had received limited treatment, was able to do heavy lifting, and experienced no significant functional limitations from it. (Tr. at 20.)

total in a work day, with no significant or continuous walking, no climbing, and the ability to elevate his feet to stool level during any prolonged sitting. He stated that this RFC was consistent with the report of Dr. Tanty, aside from the requirement that plaintiff take half hour breaks every two hours, which the ALJ found was imposed without explanation. The ALJ concluded that plaintiff's daily activities, which included caring for and lifting his grandmother, cooking, vacuuming, sweeping and cleaning, were consistent with this RFC. The ALJ determined that given plaintiff's activities and limited medical treatment, his subjective symptoms lacked credibility to the extent they were alleged to be disabling. (Tr. at 21.)

At step four, the ALJ determined that in light of this RFC plaintiff could not perform his past work as a cook or dishwasher because such work was at the medium exertional level. (Tr. at 21.) However, at step five the ALJ concluded that there were other jobs plaintiff could perform. The ALJ first noted that Grid Rule 202.18 directed a conclusion of not disabled for a person, such as plaintiff, who was a "younger individual," with a limited education and no transferrable work skills, limited to light work. (Tr. at 21.) However, because plaintiff was unable to perform a full range of light work, the ALJ relied on the testimony of the VE that plaintiff could perform other jobs existing in significant numbers. (Tr. at 21, 23 #13.) Therefore, based on this testimony and using Grid Rule 202.18 as a framework, the ALJ found plaintiff not disabled. (Tr. at 22-23.)

The Appeals Council denied review on April 1, 2005. (Tr. at 4.)

## III. DISCUSSION

Plaintiff argues that (1) the ALJ failed to obtain a valid waiver of his right to counsel and to properly develop the record in the absence of counsel; (2) the ALJ erred in finding

Case 2:05-cv-00587-LA   Filed 01/12/06   Page 10 of 26   Document 21

his left wrist impairment not severe; (3) the ALJ improperly assessed his RFC; (4) the ALJ inadequately assessed his credibility; and (5) the ALJ presented an incomplete question to the VE.

**A.  Waiver of Counsel/Development of the Record**

   **1.  Applicable Legal Standard**

"A claimant has a statutory right to counsel at disability hearings."  Thompson v. Sullivan, 933 F.2d 581, 584 (7th Cir. 1991).  The claimant must be properly informed of this right and may waive it only if given sufficient information to enable him to make an intelligent decision on whether to retain a lawyer or proceed pro se.  Id.  To ensure a valid waiver of counsel an ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25% of past due benefits and required court approval of fees.  Binion v. Shalala, 13 F.3d 243, 245 (7th Cir. 1994).

If the ALJ does not obtain a valid waiver, the matter must be remanded for a new hearing unless the Commissioner can establish "that the ALJ fully and fairly developed the record."  Id.  The ALJ's duty is met if he probes the claimant for possible disabilities and uncovers all of the relevant evidence.  Id.  If the Commissioner makes the required showing, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap.  Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant."  Id.  However, "a significant omission is usually required before this court will find that the Secretary failed to assist pro se claimants in developing the record fully and fairly."  Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994).

11

"In other words, the omission must be prejudicial."  <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1235 (7th Cir. 1997).

### 2.    Analysis

In the present case, the parties agree that the ALJ did not explain the three <u>Binion</u> points to plaintiff.  The ALJ confirmed that plaintiff knew he had the right to be represented and that plaintiff was willing to proceed pro se, but he failed to advise plaintiff of the manner in which an attorney could aid in the proceedings, the possibility of free counsel or a contingency arrangement, or the limitation on attorney fees to 25% of past due benefits and required approval of fees.  Nor did the waiver form plaintiff signed contain the necessary information.  The form advised plaintiff that he may qualify for free legal services from a legal aid organization but omitted any mention of the first and third <u>Binion</u> points.  (Tr. at 47.) Therefore, plaintiff's waiver was invalid, and the Commissioner must accordingly demonstrate that the record was fully and fairly developed in counsel's absence.[6]

The Commissioner notes that the ALJ had before him the reports of two consultants and the treating source, Dr. Tanty, as well as the medical records plaintiff indicated bore upon his claim.  The ALJ asked plaintiff if there were any other records that would be helpful in deciding the case, and plaintiff said no.  (Tr. at 187.)  The ALJ then asked plaintiff about his educational background and prior work (Tr. at 168), the impairments that allegedly

---

[6]As I and other judges of this district have noted, ALJs regularly fails to obtain valid waivers.  <u>Henderson v. Barnhart</u>, 205 F. Supp. 2d 999, 1010 (E.D. Wis. 2002). This problem could be solved by adopting a form containing all of the required information and directing ALJs to review it with unrepresented claimants prior to the hearing.  The Commissioner's lawyers, who are forced to defend records developed without validly waived counsel, may want to take appropriate steps within the agency to address this problem.

12

prevented him from working (Tr. at 169; 172), his pain symptoms and flare-ups (Tr. at 170-71; 172), his medication and other treatment (Tr. at 171-72), his daily activities (Tr. at 173-74) and his exertional abilities (Tr. at 174-75). He concluded by allowing plaintiff to say anything else about his condition that had not been covered, both at the conclusion of plaintiff's direct testimony (Tr. at 175) and after the VE's testimony (Tr. at 182). As in Binion, the "ALJ probed into all of the relevant areas, questioning plaintiff about the medical evidence in the file, [his] medication, pain, daily activities, and physical ability to perform a number of activities." 13 F.3d at 245; see also Luna, 22 F.3d at 693 (finding that record was developed where ALJ inquired about claimant's pain, medication and activities). The ALJ also called a VE to assist him in considering the vocational impact of plaintiff's impairments.

Plaintiff counters that his hearing was only one-half hour long. (Tr. at 166, 186.) In Sears v. Bowen, 840 F.2d 394, 403 (7th Cir. 1988), the court held that the record was inadequately developed in a case in which the hearing lasted thirty-two minutes and produced a transcript of twenty-nine pages. However, the court did not hold that a hearing must last a certain length of time in order to satisfy the standard of full development. Instead, the court noted that the ALJ in that case failed to inquire into certain critical areas. Id. at 403-04. The court concluded: "In sum, no single factor, when considered in isolation, appears to mandate reversal. Rather, it is the unfortunate confluence of a number of different factors, some minor, and including the very impairments themselves, which resulted in Sears' mental impairments not being considered by the ALJ or the Appeals Council." Id. at 404. Thus, Sears established no bright line rule of assistance to plaintiff.

But plaintiff argues that, as in Sears, the ALJ in his case also failed to question him on important issues such as how much time he spent caring for his grandmother during the

13

day (including how often he lifted her) as opposed to how much time he spent sitting, how bad his pain was and how often it occurred, how often he experienced "bad days," and how his weight affected his ability to walk, sit and stand. However, I find that the Commissioner has shown that these areas were sufficiently covered. In response to the ALJ's question about what he did in a typical day, plaintiff stated that he cared for his grandmother from 5:30 a.m. to 7:00 p.m. (Tr. at 173.) Plaintiff also testified that he helped her to the bathroom (Tr. at 173) and carried her to bed (Tr. at 175). The ALJ also questioned plaintiff about his pain, including how often it occurred (one to five times per month) and how long it lasted (three to seven days) (Tr. at 169-70), and plaintiff provided a detailed description of the nature of the pain (Tr. at 170-71). The ALJ further asked plaintiff what he did about his grandmother during a flare-up, and plaintiff replied that he still had to help her, that she had "a lot more pain than I do," and that he "just deal[t] with the pain." (Tr. at 182.) Finally, the ALJ asked plaintiff about his ability to stand, sit and walk (Tr. at 174-75), which sufficiently covered any effects of plaintiff's obesity on those abilities. Therefore, I find that the testimonial record was sufficiently developed. See Nelson, 131 F.3d at 1235-36 (affirming "where the ALJ had before him a fairly complete picture" of the claimant's condition despite the fact that the hearing was "marginal").

Plaintiff next states that the ALJ failed to obtain fourteen pages of Dr. Tanty's treatment notes dated August 2, 2000 to January 22, 2003.[7] However, the SSA did request records from Falls Medical Group, which provided some treatment notes from Dr. Tanty. (Tr. at 121-23.) It is unclear why the notes plaintiff now submits were not included. Further,

---

[7]Plaintiff included these records with his main brief.

14

plaintiff stated at the hearing, after reviewing the information in the file, that nothing more was needed for the ALJ to decide the case. (Tr. at 167.) Plaintiff states that he was nervous and lacked the time to fully review the file. However, there is no support for this assertion in the record; the hearing testimony reflects that plaintiff was able to express himself without any signs of excessive nervousness. And, plaintiff's statement to the ALJ was consistent with previous statements he made to the SSA that he had seen Dr. Tanty only once (Tr. at 72) and that he had no further medical treatment to report (Tr. at 96, 106, 107, 109).

Even if the ALJ erred in not getting these records, plaintiff suffered no prejudice. As plaintiff himself concedes, these notes "are not excessively revealing." (R. 13 at 13.) On August 2, 2000, he was seen for a rash and provided Medrol and Claritin (R. 14 at [un-paginated]1-3), prescriptions that were noted in the records the ALJ had (Tr. at 122). On September 1, 2000, he was again seen for a rash and provided Claritin. (R. 14 at [un-paginated] 4-6.) In February 2001, he was provided medication for bronchitis (R. 14 at [un-paginated] 7-8), which prescriptions were also included in the records the ALJ had (Tr. at 122). On July 20, 2001, plaintiff was seen for right foot pain, two days after his visit to St. Joseph's Hospital, and provided Celebrex. (R. 14 at [un-paginated] 9.) While the ALJ did not have this specific record, he did have before him all of the information it contained. (Tr. at 113-20, 122.) On December 30, 2002, plaintiff was seen complaining of mild left wrist pain. Dr. Tanty noted only very mild tenderness and no warmth or redness. He diagnosed tendinitis and provided plaintiff with a wrist splint. (R. 14 at [un-paginated] 10-11.) Again, while the ALJ did not have this specific record before him, Dr. Tanty's January 22, 2003 report mentioned this condition. (Tr. at 144.) Further, there is no reason to believe that this

15

record, which contained only minimal findings, would have had any effect on the ALJ's decision. Finally, plaintiff was seen for a cough on January 22, 2003 and for hemorrhoids on April 30, 2003. (R. 14 at [un-paginated] 13-14.) There is no indication that either condition was more than transient or had any effect on plaintiff's ability to work.

Therefore, I find that the Commissioner has demonstrated that the record was fully and fairly developed, and that plaintiff has not demonstrated prejudice or an evidentiary gap.

## B.    Plaintiff's Left Wrist Impairment

### 1.    Legal Standard

As noted above, at step two of the sequential evaluation process the ALJ determines whether the claimant has any severe impairments. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). "[A]n impairment(s) that is 'not severe' must be a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p.

At step two, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on the claimant's ability to do basic work activities. SSR 85-28. "The vocational factors of age, education, and work experience are not considered[.]" SSR 96-3p. The regulations provide that great care should be exercised in applying the "not severe" impairment concept, and the process should not end unless the adjudicator is able to clearly determine the effect of an impairment or combination of impairments on the claimant's ability to do basic work activities. Lopez-Navarro v. Barnhart, 207 F. Supp. 2d 870, 880-81 (E.D. Wis. 2002) (citing SSR 85-28); see also SSR 96-3p ("[I]f . . . the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work

16

activities, the adjudicator must continue to follow the sequential evaluation process until a determination or decision about disability can be reached."). Finally, if the ALJ finds that some impairments are severe and others not, he must, in assessing RFC "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p.

### 2. Analysis

In the present case, the ALJ found that plaintiff's left wrist problem was not a severe impairment because plaintiff had received no treatment aside from a wrist splint, he could still do heavy lifting, and the medical evidence supported no functional limitations. (Tr. at 20.) Plaintiff contends that in so finding the ALJ misstated his testimony, ignoring the qualification that he was able to use his hands when his "carpal tunnel" was not bothering him.[8] Further, Dr. Tanty, who diagnosed tendinitis of the left wrist, provided restrictions on repetitive motions with the left hand in his January 22, 2003 report. Plaintiff contends that when his left wrist impairment is considered in combination with his other severe impairments, the ALJ should have found that it too was severe.

However, the ALJ did not screen out plaintiff's claim at step two. Rather, he found other severe impairments and continued with the sequential evaluation process, pursuant to which he was required to consider all impairments, severe or not, in setting RFC. SSR 96-8p. In such a case, the question for the court becomes whether the ALJ's alleged error in finding an impairment not severe at step two affected the RFC determination and thus the

---

[8]There is no indication in plaintiff's medical records that he suffers from carpal tunnel syndrome.

outcome of the case.  <u>Masch v. Barnhart</u>, No. 05-C-0625, 2005 U.S. Dist. LEXIS 36048, at *40-41 (E.D. Wis. Dec. 20, 2005).

In her reply brief, plaintiff argues that the ALJ erred at step two because his wrist impairment affects his ability to perform basic work activities, such as repetitive work with the left hand.  However, he concedes that he cannot demonstrate reversible error at steps four and five, stating: "While this issue may not be a determining factor in having this case remanded, it is certainly one of the factors this Court should consider in determining whether the ALJ committed error by not complying with the Commissioner's Regulations and Ruling." (R. 20 at 4-5.)  Because plaintiff has not even alleged, much less shown, that this alleged error was harmful, I cannot reverse based on the ALJ's step two determination on plaintiff's wrist impairment.

## C.    RFC

### 1.    Legal Standard

RFC is what an individual can still do despite his impairments in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  The RFC assessment must address both the "exertional" and "non-exertional" capacities of the individual.   Exertional capacity concerns the claimant's remaining abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  Nonexertional capacity includes all work-related limitations and restrictions that do not depend on an individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and

18

responding appropriately to supervision) activities. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. The ALJ must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. SSR 96-8p.

>    2.    **Analysis**

In the present case, the ALJ found that plaintiff retained the RFC to lift ten pounds frequently and twenty pounds occasionally, stand for up to fifteen minutes continuously and two hours total in a work day, with no significant or continuous walking, no climbing, and the ability to elevate his feet to stool level during any prolonged sitting. He stated that this determination was generally consistent with the report of Dr. Tanty. (Tr. at 20.)

Plaintiff contends that the ALJ's RFC determination varied from Dr. Tanty's report in four ways. First, he argues that the ALJ failed to adequately explain why he did not follow Dr. Tanty's opinion that he required a sit/stand option and thirty minute breaks every two hours. (Tr. at 146.) However, the ALJ rejected this limitation because Dr. Tanty provided no explanation for it. (Tr. at 20.) ALJs may properly reject restrictions that are "unsupported by any explanation or evidence." Haynes v. Barnhart, 416 F.3d 621, 631 (7th Cir. 2005). Further, as the ALJ also noted, plaintiff himself testified that sitting was not a problem for him and that he sat when not helping his grandmother (Tr. at 17, 173, 175); Dr. Tanty opined that plaintiff could sit continuously for more than two hours (with his foot elevated) and for at least six hours in an eight hour day (Tr. at 146); and the ALJ limited plaintiff to jobs where he was sitting for about six out of eight hours, with the further limitation that he be able to elevate his foot during periods of prolonged sitting (Tr. at 20).

19

Second, plaintiff notes that Dr. Tanty wrote that his legs should be elevated to "foot stool/even/level" for 60% of the day (Tr. at 146-47), while the ALJ found that plaintiff needed to elevate his feet to "stool level during any prolonged sitting" (Tr. at 20).[9] Plaintiff fails to show that the ALJ's limitation materially varied from Dr. Tanty's report. At the hearing, plaintiff testified that he needed to elevate his foot higher than twelve inches (Tr. at 181), but it is far from clear that Dr. Tanty's report imposed a greater restriction than did the ALJ. When asked how high plaintiff's legs needed to elevated, Dr. Tanty wrote: "foot stool/even/level." (Tr. at 146.) It was not unreasonable for the ALJ to assume that use of an ordinary foot stool would suffice; the report does not state that the legs must be elevated such that they are even or level with the rest of the body, as plaintiff contends. Finally, the VE did not alter her analysis based on plaintiff's comment that he required elevation higher than twelve inches. (Tr. at 181.)

Third, plaintiff argues that the ALJ did not account for Dr. Tanty's finding that he would likely miss one day of work per month due to his impairments. (Tr. at 147.) This was, at most, harmless error because employers typically tolerate this level of absenteeism. Dixon v. Massanari, 270 F.3d 1171, 1179 (7th Cir. 2001) (addressing testimony from VE Hoynik).

Fourth, plaintiff argues that the ALJ erred by not accepting Dr. Tanty's limitations on use of his left hand for repetitive motions. However, as the Commissioner notes, Dr. Tanty's opinion on this issue was not supported by objective medical findings. Further, as the ALJ noted in his decision, Dr. Jankus found plaintiff to have normal grip strength (Tr. at 18) and

---

[9]At the hearing, the VE assumed that stool level was about twelve inches off the ground. (Tr. at 179.)

plaintiff testified that he was generally able to use his hands and could engage in heavy lifting (Tr. at 17, 20). Finally, as with his step two argument based on his wrist condition, plaintiff does not in his reply brief assert that failure to include such limitations in the RFC constituted harmful error.

Plaintiff also contends that the ALJ did not properly consider the effects of his obesity. Although obesity no longer has its own Listing, it can still constitute a severe impairment, "equal" (or in combination with other impairments "meet") a Listing, and affect the claimant's RFC. Masch, 2005 U.S. Dist. LEXIS 36048, at *24-25. As is relevant to the RFC assessment, the SSA has acknowledged that

> obesity may limit the person's exertional abilities (e.g., sitting, standing, walking, lifting, carrying, pushing, and pulling), ability to perform postural functions (e.g., climbing, balancing, stooping, and crouching), and ability to work on a regular and continuing basis. "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."

Id. at *28 (quoting SSR 02-1p at 6).

In the present case, the ALJ found that plaintiff's obesity was a severe impairment (Tr. at 22 #3) but, plaintiff contends, failed to address its impact on his ability to stand, walk and sit. It is true that, as plaintiff states, obesity can impact on the claimant's ability to stand or sit, or aggravate another painful condition. However, the ALJ did place limits on plaintiff's standing, walking and sitting, consistent both with plaintiff's testimony and Dr. Tanty's opinion, and plaintiff fails to show that his obesity plausibly limited him further. The issue in cases such as this is the effect of obesity on the person's ability to work; "once its causal efficacy is determined, it drops out of the picture." Gentle v. Barnhart, 430 F.3d 865, 868

Case 2:05-cv-00587-LA   Filed 01/12/06   Page 21 of 26   Document 21

(7th Cir. 2005).  Because there is no suggestion in the record or plaintiff's briefs that any effects of obesity were not incorporated into the RFC, the ALJ's failure to explicitly mention obesity in setting RFC was at most harmless error.[10]  Cf. Masch, 2005 U.S. Dist. LEXIS 36048, at *32 (reversing where ALJ found that plaintiff's obesity was severe and would affect her tolerance for prolonged standing and walking, yet determined that she retained the RFC for light work, which requires a good deal of walking and standing, without accounting for any limitation based on obesity).

**D.    Credibility**

   **1.    Legal Standard**

   Generally, the court must defer to the ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing.  Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004).  Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong."  Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).  "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision."  Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994).  Further, the ALJ must comply with SSR 96-7p in evaluating credibility.  Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).

   SSR 96-7p establishes a two-step process for evaluating the credibility of the claimant's testimony about symptoms such as pain, fatigue or weakness.  Blom v. Barnhart,

---

[10]I note that in his step three discussion the ALJ found that plaintiff had no "major dysfunction of a joint."  (Tr. at 20.)  This plainly referred to whether plaintiff's obesity medically equaled a Listed impairment.  See SSR 02-1p at 5.

22

363 F. Supp. 2d 1041, 1054 (E.D. Wis. 2005). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. Id. (citing SSR 96-7p).

Second, if the claimant has an impairment that could reasonably produce his pain or other symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms. Id. (citing SSR 96-7p). The ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995). Rather, he must consider the entire record, including the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medication; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. While SSR 96-7p and § 404.1529 do not require the ALJ to analyze and elaborate on each of these factors when making a credibility determination, the ALJ must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Blom, 363 F. Supp. 2d at 1055.

**2. Analysis**

In the present case, the ALJ found, based on plaintiff's daily activities, sporadic treatment, and lack of prescribed pain medication, that plaintiff's testimony about his symptoms lacked credibility to the extent he purported to be disabled. (Tr. at 21.) Plaintiff argues that the ALJ failed to comply with SSR 96-7p, failed to consider why he was not

taking prescribed pain medication (contrary to SSR 82-59), and did not recognize that his daily activities were limited. Plaintiff's arguments fail.

First, the ALJ acknowledged the credibility standard from SSR 96-7p and § 404.1529, including the requirement that he not reject plaintiff's testimony based solely on the lack of objective medical evidence. (Tr. at 19.) And, in his narrative discussion he covered most of the pertinent factors from the regulations. (Tr. at 16-17, 19-21.)

Second, it was appropriate for the ALJ to mention plaintiff's extremely limited treatment. See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). Plaintiff's citation of SSR 82-59 is inapposite because that Ruling deals with the situation in which a claimant has refused to follow a course of treatment that would restore his ability to work. In that situation, the ALJ must consider any reasons the claimant may have for his failure to receive treatment, including inability to pay for it, before denying the claim. SSR 82-59. Because the ALJ did not find plaintiff disabled but for his failure to take medication, that scenario was not presented here.[11]

Third, given the substantial responsibility plaintiff had in caring for his grandmother from 5:30 a.m. until 7:00 p.m., as well as his testimony concerning his other household chores, I doubt that plaintiff's daily activities can be considered "truly 'minimal.'" Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002). Plaintiff testified that he assisted his grandmother in going to the bathroom, fetched her medication, prepared her meals, and

_____

[11]Further, the ALJ asked plaintiff whether his doctor had recommended any other treatment that plaintiff had not attempted, and plaintiff said no. (Tr. at 172.) Thus, there was no violation of SSR 96-7p in this regard. Cf. Brown v. Barnhart, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004).

24

carried her to bed, and that he did so even when experiencing severe pain.[12]  (Tr. at 173, 182.)  The Seventh Circuit has recently noted that caring for an infant in the home is not necessarily consistent with an ability to work full time, Gentle, 430 F.3d at 867-68, but the ability to provide full-time care to a disabled adult is surely something the ALJ can consider. In any event, as in Johansen, the ALJ in the present case did not rely solely on "minimal" daily activities but rather considered the record as a whole in concluding that plaintiff's testimony was not fully credible.  See 314 F.3d at 288.  Indeed, as the ALJ noted, plaintiff stated that he quit his last job not because of pain but because it did not pay enough.[13]  (Tr. at 16.)  And, as discussed, the ALJ adopted a restrictive RFC that called for plaintiff to work in a seated position most of the day, with his foot elevated.  This was essentially consistent with what plaintiff said he did when in pain.

Therefore, for all of these reasons, I find that the ALJ did not err in assessing plaintiff's credibility.[14]

_____

[12]Plaintiff complains that the ALJ failed to develop the record on precisely what he did during the time he cared for his grandmother, i.e. how often he assisted her to the bathroom, lifted her, administered medication, fed her, etc.  While perhaps the ALJ's questioning could have been more probing, he did ask plaintiff what he did during a typical day, and plaintiff replied that he cared for his grandmother "pretty much . . . from 5:30 in the morning until roughly 7:00 at night." (Tr. at 173.) The ALJ also asked plaintiff what he did about his grandmother during flare-ups.  (Tr. at 182.)  Finally, the ALJ did not rely solely on plaintiff's care for his grandmother in finding him not fully credible.

[13]It is true that plaintiff quit working in 1999, before the alleged onset of disability in July 2001.  Nevertheless, it was reasonable for the ALJ to consider this factor in deciding whether plaintiff was prevented from working due to his impairments as opposed to other factors.  Plaintiff also testified at the hearing that what kept him from working was that his grandmother needed care all the time.  (Tr. at 169.)

[14]Plaintiff also argues that the ALJ did not present a complete hypothetical to the VE because he omitted the left hand restrictions found by Dr. Tanty.  For the reasons

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case

is **DISMISSED**.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 12th day of January, 2006.

/s Lynn Adelman

_____

LYNN ADELMAN
District Judge

_____

stated in § B. and C. above, this argument also fails.  See also Ehrhart v. Sec'y of
HHS, 969 F.2d 534, 540 (7th Cir. 1992) (stating that ALJ's hypothetical need only
include those limitations supported by the medical evidence).